Michael J. Mitchell, P.C.
Attorneys for Plaintiff
PCL (SHIPPING) PTE LTD.
494 Eighth Avenue, 7th Floor
New York, New York 10001
Telephone:    (646) 328-0120
Facsimile:    (646) 328-0121
Michael J. Mitchell (MM9005)
MIMOMA@RCN.COM

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------X

PCL (SHIPPING) PTE LTD.,                                    09-CV 00205 (AKH)

                          Plaintiff,

        -against-

DREYMOOR FERTILIZERS OVERSEAS PTE LTD.,

                          Defendant.

-------------------------------------------------------------X


## PLAINTIFF'S MEMORANDUM OF LAW
## IN RESPONSE TO MOTION TO VACATE DATED DECEMBER 23, 2009


MICHAEL J. MITCHELL, P.C.
494 Eighth Avenue, 7th Floor
New York, NY 10001
(646) 328-0120 (phone)
(646) 628-0121 (fax)

*Attorneys for Plaintiff,*
*PCL (SHIPPING) PTE LTD.*

*Of counsel:*
Michael J. Mitchell, Esq.

## TABLE OF CONTENTS

TABLE OF AUTHORITIES..................................................................................ii-v

PRELIMINARY STATEMENT .........................................................................1

SUMMARY OF THE ARGUMENT..................................................................2

STATEMENT OF FACTS ..................................................................................7

ARGUMENT.......................................................................................................8

POINT I - THE ATTACHMENTS MADE IN THIS CASE SHOULD NOT
BE VACATED BECAUSE OF THE SECOND CIRCUIT'S *JALDHI* DECISION...........8

A.    WHEN INTERPRETING AN UNSETTLED ISSUE OF NEW YORK LAW,
      DISTRICT COURTS MUST CONSIDER HOW NEW YORK STATE COURTS
      WOULD DECIDE THE ISSUE.................................................................. 8

B.    NEW YORK LAW PERMITS ATTACHMENT OF EFTS IN THE POSSESSION
      OF INTERMEDIARY BANKS................................................................. ...9

C.    DEFENDANTS HAVE A PROPERTY INTEREST IN THE SEGREGATED
      SUSPENSE ACCOUNT INTO WHICH FUNDS REPRESENTING THE
      RESTRAINED (FORMER) EFTS WERE PLACED BY THE GARNISHEE
      BANKS, WHICH INTEREST LAWFULLY WAS ATTACHED BY SUCCESSIVE
      SERVICE OF A VALID MARITIME ATTACHMENT ORDER............................12

      1.    Funds in the suspense accounts are not EFTs;
            rather, they are attachable bank credits .................................................12

      2.    Defendants have an attachable property
            interest in suspense account funds .......................................................13

POINT II - THE NEW RULE ANNOUNCED IN *JALDHI* NEED NOT DETERMINE
THE OUTCOME OF WHETHER DEFENDANT'S FUNDS REMAIN UNDER
ATTACHMENT................................................................................................... 20

POINT III - THIS COURT SHOULD EXERCISE ITS EQUITABLE POWER TO
MAINTAIN THE *STATUS QUO* AND RETAIN THE FUNDS UNDER
ATTACHMENT...................................................................................................23

POINT IV - THIS COURT SHOULD GRANT DECLARATORY JUDGMENT
TO PLAINTIFF THAT THE ATTACHMENT WAS NOT
WRONGFUL........................................................................................................ 27

CONCLUSION..................................................................................................... 28

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Aqua Stoli Shipping Ltd. v. Gardner Smith Pty Ltd.,*
    460 F.3d 434 (2d Cir. 2006)...................................................................23

*Astrea United Investments, L.P. v. B. T Onitiri,*
    92 Civ. 0581 (MBM), 1992 WL 346353 (S.D.N.Y. 1992) ............................16

*Aurora Maritime Co. v. Abdullah Mohamed Fehem & Co.,*
    85 F.3d 44 (2d Cir. 1996) ..............................................................13

*Banque Worms v. BankAmerica Int'l,*
    77 N.Y.2d 362 (1991) ...............................................................20

*Consub Delaware LLC v. Schahin Engenharia Limitada,*
    543 F.3d 104 (2d Cir. 2008)..................................................passim

*Cosco Logistics (Dalian) Co. Ltd. v. Beitai Iron & Steel Group Import & Export Co.,*
    08-cv-7988 (DC) (S.D.N.Y. Nov. 25, 2008) ........................................15

*CSL Australia Ply Ltd. v. Britannia Bulkers Plc, et al,*
    08-cv-8290 (PKL) (S.D.N.Y. order dated May 5, 2009) ............................15

*Esso Standard (Switzerland) v. The Arosa Sun,*
    184 F.Supp. 124 (S.D.N.Y. 1960)..................................................18

*Gala Enterprises, Inc. v. Hewlett Packard Co.,*
    970 F.Supp. 212 (S.D.N.Y. 1997)..................................................16

*Greenwich Marine, Inc. v. S.S. Alexandria,*
    339 F.2d 901 (2d Cir. 1965)......................................................23-24

*Harper v. VA Dep't of Tax,*
    509 U.S. 86 (1997)...............................................................20

*Huddleston v. Dwyer,*
    322 U.S. 232 (1944)................................................................8

*India Steamship Co. Ltd. v. Kobil Petroleum Ltd.,*
    No. 09-4564-cv (2d Cir. Nov. 3, 2009) ..............................................8

*In re Eastern and Southern Districts Asbestos Litig.,*
    772 F. Supp. 1380 (E. & S.D.N.Y. 1991) (Weinstein, J.), *rev'd on other grounds sub
    nom. In re Brooklyn Navy Yard Asbestos Litigation,* 971 F.2d 831 (2d Cir. 1992)...........8-9

*Kingston Dry Dock Co. v. Lake Champlain Transportation Co.,*

31 F.2d 265 (2d Cir. 1929).................................................................6, 19

*Knox v. The Bank of New York,*
    07 cv 3349 (VM) (S.D.N.Y. Sept. 7, 2007)..........................................................9

*Koroleski v. Badler,*
    32 A.D.2d 810, N.Y.S.2d 221 (2d Dep't 1969)......................................................16

*Manufacturas Int'l, Ltda v. Manufacturers Hanover Trust Co.,*
    792 F. Supp. 180 (E.D.N.Y. 1992) (Weinstein, J.), *aff'd,* 47 F.3d 1159 (2d Cir.), *cert.*
    *denied,* 515 U.S. 1132 (1995)................................................................9-11, 20

*Margo v. Weiss,*
    213 F.3d 55 (2d Cir. 2000)................................................................20-21

*MedImmune, Inc. v. Genentech, Inc.,*
    549 U.S. 118 (2007)................................................................19

*Navalmar (U.K.) Ltd. v. Welspun Gujarat Stahl Rohren, Ltd.,*
    485 F. Supp. 2d 399 (S.D.N.Y. 2007) ................................................................3

*Palestine Monetary Authority v. Strachman,*
    873 N.Y.S.2d 281 (1st Dep't Feb. 17, 2009)................................................passim

*Petrohawk Energy Corp. v. Law Debenture Trust Co.,*
    No. 06-nc-9404 (DLC), 2007 U.S. Dist. Lexis 5803 (S.D.N.Y. January 29, 2007)............16

*Proshipline, Inc. v. Aspen Infrastructures Ltd.,*
    585 F.3d 105 (2d Cir. 2009)................................................................15

*Reynoldsville Casket Co. v. Hyde,*
    514 U.S. 749 (1995)................................................................21-22

*Sachem Shipping v. Industrial Carriers Inc.,*
    08-cv-8698 (Swain, J.)................................................................16

*Shipping Corp. of India Ltd. v. Jaldhi Overseas Pte Ltd.,*
    585 F.3d 58 (2d Cir. 2009) ................................................................passim

*Stokes v. Girdich,*
    No. 07-0223-pr, 2009 WL 579139 (2d Cir. Mar. 5, 2009)................................26

*Swift & Co. v. Compania Caribe,*
    339 U.S. 684 (1950)................................................................23-24

*Tarstar Shipping Co. v. Century Shipline Ltd.,*
    451 F. Supp. 317 (S.D.N.Y. 1978)................................................................16

*UR. C., Inc. v. Applied Images, Inc.,*
    431 N.Y.S.2d 859 (Sup. Ct. Nassau Cty. 1980)................................................16

*United States v. Daccarett,*
   6 F.3d 37 (2d Cir. 1993).................................................................2

*United States v. Vallee,*
   304 Fed. Appx. 916 (2d Cir. 2008)...............................................26

*Vamvaship Maritime Ltd. V. Shivnath Rai Harnarain (India) Ltd.,*
   No. 06 Civ. 1849, 2006 WL 1030227 (S.D.N.Y. Apr. 20, 2006)..............................20

*Vandenbark v. Owens-Illinois Glass Co.,*
   311 U.S. 538 (1941)......................................................................8

*Vaughan v. Atkinson,*
   369 U.S. 527 (1962)................................................................23-24

*Winter Storm Shipping v. TPI,*
   310 F.3d 263 (2d Cir. 2002)..................................................passim

**STATUTES**

NY UCC 4A................................................................................passim

NY UCC 4A-406.............................................................................17

NY UCC 4A-501.............................................................................13

NY UCC 4A-502...........................................................................3, 9-10

NY UCC 4A-503..........................................................................passim

UCC 4-A.............................................................................5-6, 10, 18, 20

Rule B..................................................................................passim

FRCP 57...................................................................................27

## PRELIMINARY STATEMENT

Defendant moved, by motion dated December 23, 2009 to vacate the maritime attachments in this matter.

Defendant's motion raises the following issues:

(1) Federal district courts presented with an issue of state law are to follow state appellate court decisions over pronouncements of state law made by its federal appellate court. *Jaldhi* applied New York law, but that Court was unable to consider a recent decision of the Appellate Division of the New York Supreme Court that specifically held that EFTs stopped by an intermediary bank are property that may be subject to attachment depending on the facts. This Court should follow the holding of the highest New York court to have decided the issue.

(2) National maritime federal common law permits attachment of a bank account in which a defendant has an interest. The property currently attached in this case are not EFTs, but a segregated suspense bank account into which funds representing the EFTs were deposited by the garnishee bank. This issue was not before the Second Circuit in *Jaldhi*. Should this court order the release of the suspense funds, it will order that they are paid to the defendant or released according to the defendant's instructions. Suspense funds are therefore property in which the defendant has an interest subject to attachment.

(3) Retroactive application of an appellate court decision is not mandatory when: (a) it announces a new rule, (b) parties relied on prior settled law, (c) non-retroactive application would not hinder the new rule's future effectiveness, and (d) retroactive application would be inequitable. Plaintiff relied on well-established precedent that EFTs are attachable property of a defendant in deciding what precautions to take and in commencing arbitration: *Jaldhi* itself recognized that it constituted a complete reversal of existing law. Maintaining the status quo as

1

to prior attachments in other cases will not affect *Jaldhi*'s future application, and plaintiff would be severely prejudiced by retroactive application. A district court sitting in admiralty has inherent power to adapt an admiralty rule to the equities of a particular situation. This court should refrain from applying *Jaldhi* retroactively under the circumstances of this case.

Plaintiff, PCL (Shipping) Pte Ltd. ("Plaintiff"), respectfully submits that this Court should not vacate the attachments that already have been effected in this case.

In addition, Defendant Dreymoor has alleged in the London arbitration that the initial attachment of Defendant's funds was wrongful and claimed damages from alleged wrongful attachment. Plaintiff respectfully submits that this Court should issue declaratory judgment that the attachment of Defendant's funds was not "wrongful."

## SUMMARY OF THE ARGUMENT

In *Jaldhi*, a Panel of Second Circuit Court of Appeals overruled the holdings of *Winter Storm Shipping v. TPI*, 310 F.3d 263 (2d Cir. 2002), and its progeny that held that EFTs passing through New York intermediary banks are attachable property of the defendant under federal maritime law. The court ruled that *Winter Storm's* reliance on *U.S. v. Daccarett*, 6 F.3d 37 (2d Cir. 1993), was misplaced and that New York law, rather than federal maritime law, governed the question of whether EFTs may be attached pursuant to Rule B. After so holding, the *Jaldhi* court concluded that: (1) New York law, NY UCC 4A-503 "does not permit" attachment of EFTs, and (2) that under New York law, neither originators nor beneficiaries have a property interest in EFTs. The *Jaldhi* court's interpretation of New York law, however, was both incorrect and incomplete.

*Jaldhi* was incorrect because New York law *does* "permit" creditors to serve process as against EFTs in intermediary banks; intermediary banks simply are not obliged to honor it. The

2

First Department's decision in *Palestine Monetary Auth. v. Strachman*, 873 N.Y.S.2d 281 (1st Dep't Feb. 17, 2009) (hereafter "*PMA*"), decided a mere eight months before *Jaldhi* but after briefing and agreement, makes clear that intermediary banks in EFT transactions have absolute discretion to ignore creditor process. Hence, consistent with the Second Circuit's desire expressed in *Jaldhi* and as stated by *PMA*, intermediary banks have discretion to ignore Rule B process going forward. But *PMA* also makes clear that an intermediary bank *may* honor creditor process to restrain an EFT, either voluntarily or under its perceived legal and moral obligations. In such circumstances, under New York law as held by the First Department, the restrained EFT may be attached by creditor process so long as the defendant has an interest.[1]

Further, if an intermediary bank honors creditor process served upon it, no violation of

---

[1]    This Court has previously had occasion to address the attachability of EFTs. Specifically, in *Navalmar (U.K.) Ltd. v. Welspun Gujarat Stahl Rohren, Ltd.*, 485 F. Supp. 2d 399, 410 (S.D.N.Y. 2007), this Court reasoned as follows:

> "[t]he drafters of the Uniform Commercial Code, taking a policy position that favors an uninterrupted flow of EFTs, provided that creditors' levies should be honored only at the originating and receiving banks, and stated in a Comment that an EFT in the hands of an intermediary bank is not a "property interest" that the "beneficiary's creditor can reach." N.Y. U.C.C. § 4-A-502 cmt. 4. But clearly it is property, for the money belongs to someone, either the originator of the funds transfer, or the beneficiary, directly or through their banks. The statement of the drafters is a statement of state legislative policy, not an analysis to declare, or negate, property rights."

*Navalmar*, 485 F.Supp.2d. at 408.

This Court also observed in the *Navalmar* case that:

> Under *Reibor*, a plaintiff may not *compel* a garnishee to hold service of process for maritime attachment effective until such time as a *res* comes into the garnishee's possession or the garnishee answers, but the garnishee may agree to do so, and the garnishee's procedures will not vitiate an attachment as long as they are reasonable. In any event, as *Winter Storm* observed, and as applied in the case before me, even if the service of process was ineffective, "[i]n point of fact ... [Citibank] did place the stop order ... and so [WGSR] funds were in the bank's possession when [*Navalmar's*] later processes of attachment were served, thereby satisfying the *Reibor* requirement" under any conceivable interpretation. *Winter Storm*, 310 F.3d at 274 n.7; Lyons Decl. P 18 ("personal service [of process for maritime attachment and garnishment] was again made upon Citibank on February 12, 2007").

*Navalmar,* 485 F. Supp. 2d 399, at 410.

UCC 4A-503 occurs and the attachment comports with New York law. Indeed, this same finding was made in *Consub Delaware LLC v. Schahin Engenharia Ltda*, 543 F.3d 104, 111 (2d Cir. 2008), in a portion of that opinion not abrogated by the *Jaldhi* decision because it does not rely on *Winter Storm*.

Not only did *Jaldhi* not address the *PMA* decision, but nothing in the appellate record suggests that the Second Circuit was aware of *PMA* when it issued *Jaldhi* or considered the treatment of already-attached EFTs.[2] In such circumstances, this court should not apply *Jaldhi* to already-attached EFTs on the mistaken ground that such EFTs are not "property" under New York law. Rather, the decision of the First Department (the highest court in New York having opined on the issue) makes clear that the exact opposite is true: EFTs restrained by an intermediary bank are property subject to attachment so long as the defendant has an interest. *Jaldhi* also was incomplete because the Second Circuit did not consider a critical fact: once funds representing the value of an attached EFT are restrained by a garnishee bank and transferred into in a segregated account (a practice many garnishee banks in New York follow), they no longer are an EFT. Instead, the previously ethereal EFTs have precipitated into ordinary bank account credits by their removal into a segregated suspense account.

In this case, after the garnishee banks retained funds representing the attached former EFTs in a segregated account, Plaintiff re-served the Attachment Order on the bank where each

---

[2]       That the appellant and appellee in *Jaldhi* did not address *PMA* is unsurprising - neither party challenged the proposition that EFTs are property and the docket shows that all the parties' briefs were submitted by December 15, 2008 (i.e., two months before *PMA* was decided). The Clearing House Association L.L.C. ("CHA"), which submitted the brief amicus curiae followed by the *Jaldhi* Court in overruling *Winter Storm*, likewise did not address the *PMA* decision despite the fact that the CHA's brief was submitted a week after *PMA* was decided. In May 2009, the CHA submitted an opinion letter to the Permanent Editorial Board of the UCC on behalf of the CHA, in which letter the CHA quotes its *Jaldhi* brief verbatim but adds a lengthy footnote (not contained in the *Jaldhi* amicus brief) addressing the *PMA* decision. In another amicus brief to the Second Circuit dated September 2, 2009 in the *Export-Import Bank v. Asia Pulp & Paper Co.* case, which amicus brief likewise addressed the question of whether EFTs were property under New York law, the CHA failed to cite *PMA*.

4

such segregated account was located.[3] *See Declaration of Michael J. Mitchell* ¶ 3. Accordingly, Plaintiff has validly attached Defendant's interest in the suspense account funds under both federal maritime and New York law. At the very least, discovery should be permitted to determine whether Defendant has an attachable property interest in the suspense funds. *PMA* held that the burden of showing that the defendant has no property interest in particular funds falls on the defendant and its bank. *PMA*, 873 N.Y.S.2d at ** 14 ("the burden of coming forward and demonstrating that the [bank] obtained title to the funds in the [bank] account rests with the [defendant].").

Because the UCC does not contemplate or address an intermediary garnishee bank's removal of funds restrained within the originating or beneficiary bank's correspondent bank account to a segregated suspense account, there is no specific rule applicable under New York law. Accordingly, maritime law property principles govern this analysis. Under maritime law, debts owed by a bank in which defendant has an interest are attachable. Furthermore, long-standing maritime precedent permits a defendant's equitable, contingent, and/or reversionary interests in property to be attached irrespective of *title*. Here, defendants have an equitable, contingent and/or reversionary property interest in the suspense account funds.

First, in the event that this Court were to vacate the attachment, to whom would the attached funds be released? The standard practice of Courts in this District, as well as this Court in particular, is to release the funds to the defendant (or pursuant to its wire instructions).

Second, regardless of whether Defendants are the originators or the beneficiaries of an EFT, it is likely now that the only party not "whole" by virtue of the attachment is the Defendant

---

[3]     In *PMA*, no suspense account analysis was employed by the First Department because the funds in PMA remained in the correspondent account of the originating/beneficiary bank PIB. *PMA*, 873 N.Y.S.2d at 293.

— a fact Defendant may admit or deny in its reply.

Third, Article 4-A of the UCC provides both originators and originating banks with a "money back" guarantee in the event that a wire transfer is unsuccessful, by which the garnishee intermediary bank owes the originating bank the suspense account funds and the originating bank in turn owes the originator-defendant those very same funds. Because the *res* with respect to both of these guarantees are the suspense account funds, the defendant has a beneficial and contingent property interest in that *res*. The Second Circuit recognized this more than eighty years ago, where it held that vessels to which defendant did not have title, but on which it had made a down-payment prior to a sale, were attachable based on the defendant's contingent interest in that property. *Kingston Dry Dock Co. v. Lake Champlain Trans. Co.*, F.2d 265 (2d Cir. 1929).

Fourth, there is a newly pervasive industry practice in the banking industry whereby the transferring banks have, by contract, shifted to defendants all risk and responsibility for EFTs restrained under Rule B orders. Article 4A of the UCC expressly permits such alterations. Plaintiff requires discovery to determine whether the banks explicitly have contracted away all property interests in the suspense account funds to the Defendants. An affirmative answer is supported by the fact that no bank has asserted any property interest in these funds. *PMA* noted that when a bank is merely an "agent for collection," the title to the property indeed will *not* lie with the intermediary banks. *PMA*, 873 N.Y.S.2d at **13.

In the alternative, Plaintiff respectfully submits that the *Jaldhi* holding should not be applied retroactively to already-attached funds. When Article 4-A of the UCC was first enacted, the Court of Appeals decided against giving retroactive effect to its provisions, while a federal court explicitly declined to apply the provisions of the then-newly-enacted Article 4-A to

6

already-attached EFTs. Here, where Plaintiff has detrimentally relied on the stability of the law, such a balance is especially appropriate and consistent with the well-settled rule that this Court sitting in admiralty is empowered to adapt admiralty rules to the equities of the cases before it.

Finally, the Second Circuit's concerns regarding: (1) the "uncertainty" attachments of EFTs have introduced into the international banking system, (2) the concomitant danger to the U.S. dollar's position as the world's transactional currency; and (3) the strain on the federal courts attendant to maritime attachment of EFTs are not present where EFTs already have been attached and the funds representing those EFTs have been credited to segregated suspense accounts. Indeed, the prospect and fact of rash vacatur of attached funds without proper regard to whom those funds are to be released has created substantial uncertainty across the global maritime financial market. Moreover, where exceptions to the retroactive application are appropriate, such as in this case, the Court should not be concerned with opening a Pandora's box of new cases. The *Jaldhi* decision prospectively precludes new Rule B cases involving the attachment of EFTs that fall within its reach. And with *PMA* confirming under state law that banks need not honor Rule B attachments, *Jaldhi's* future reach will be limited, indeed. Thus, what is at stake is merely the disposition of existing Rule B EFT cases already on the docket – in many cases for years.

## STATEMENT OF FACTS

The Court is respectfully referred to the pleadings and proceedings previously had herein for a full background of the facts regarding the underlying dispute. Relative to the pending Motion, however, the Court is respectfully referred to the accompanying Declaration of Michael J. Mitchell in support of Plaintiff's response to the Motion.

7

# ARGUMENT

## POINT I

### THE ATTACHMENTS MADE IN THIS CASE SHOULD NOT BE VACATED BECAUSE OF THE SECOND CIRCUIT'S *JALDHI* DECISION

**A.    When Interpreting an Unsettled Issue of New York Law, District Courts Must Consider How New York State Courts Would Decide the Issue**

In issues controlled by state law, federal courts are bound to follow the decisions of the highest court of the state. *Huddleston v. Dwyer*, 322 U.S. 232, 236 (1944). As stated by the U.S. Supreme Court nearly seventy years ago, "the duty rests upon federal courts to apply state law under the Rules of Decision statute in accordance with the then controlling decision of the highest state court." *Vandenbark v. Owens-Illinois Glass Co.*, 311 U.S. 538, 543 (1941). Not only does this rule apply to the highest courts of a state, but the *Vandenbark* Court made clear that the Supreme Court itself follows state intermediate appellate courts when no highest-court decision has been issued. *Vandenbark*, 311 U.S. at 543 n.21 (citing multiple Supreme Court cases).

*In re Eastern & Southern Dists. Asbestos Litig.*, 772 F. Supp. 1380 (E. & S.D.N.Y 1991), *rev'd on other grounds sub nom. In re Brooklyn Navy Yard Asbestos Litig.*, 971 F.2d 831 (2d Cir. 1992), applied these principles. Judge Weinstein agreed with plaintiffs' contention and followed several recent New York lower court opinions on issues related to: (1) allocations of fault to non-settling defendants in multi-defendant tort cases; and (2) interest to be awarded to a decedent's estate in New York wrongful death actions, even though earlier New York decisions and local *federal* precedent followed the defendants' views. On the wrongful death interest issue, Judge Weinstein did not follow *two* Second Circuit decisions *directly on point*, instead following intermediate state court rulings issued since the initial Second Circuit decision. *See In re Eastern & Southern Dists. Asbestos Litig.*, 772 F.Supp. at 1409-10. On appeal, the Second Circuit agreed

8

with Judge Weinstein's analysis regarding fault allocations and remanded to await the decision in a pending First Department case (which would be the first state appellate decision on the issue). *See In re Brooklyn Navy Yard Asbestos Litig.*, 971 F.2d 831, 850-51 (2d Cir. 1992). The court reversed his wrongful death holding because an intervening New York Court of Appeals decision settled the issue. *See Brooklyn Navy Yard,* 971 F.2d at 852.

Here, the First Department decided *PMA* after the parties in *Jaldhi* submitted their briefs. *PMA* apparently was not raised at oral argument in *Jaldhi* and was neither cited nor distinguished by the Second Circuit in its written opinion. Because there is no indication that the Second Circuit considered *PMA*, this court must assess Plaintiffs' position in light of *PMA*.[4]

## B. New York Law Permits Attachment of EFTs in the Possession of Intermediary Banks

*Jaldhi* purports to hold that New York law "does not permit attachment of EFTs that are in the possession of an intermediary bank." *Jaldhi*, 585 F.3d at 70 (citing NY UCC 4A-503). But this is not a correct statement of New York law; rather, NY UCC 4A-503 merely provides that intermediary banks are protected from liability for failing to heed injunctions and restraining orders. See *PMA*, 873 N.Y.S.2d at 292 (citing *Manufacturas Int'l, Ltda v. Manufacturers Hanover Trust Co.*, 792 F. Supp. 180, 194 (E.D.N.Y. 1992) (Weinstein, J.), *aff'd*, 47 F.3d 1159 (2d Cir. 1995), *cert. denied*, 515 U.S. 1132 (1995)). Hence, the only command of the law is that when an intermediary bank does honor creditor process, such bank may *not* be held liable for so doing, and the resulting attachment does not violate NY UCC 4A-502:

---

[4]    Indeed, in *Knox v. The Bank of New York*, 07 cv 3349 (VM) (S.D.N.Y. Sept. 7, 2007), a companion case to *PMA* dealing with identical issues, Judge Marrero stayed the action pending the outcome of *PMA* in the First Department ("The Court is persuaded that the pending appeal in *PMA* v. *Strachman* cautions against resolving the instant motion at this time, in order to prevent the possibility of conflicting rulings [on a matter of state law] and to have the benefit of the Appellate Division's views on the issues in dispute, particularly its views regarding the interpretation of New York state banking law.")

Moreover, *we find persuasive the [plaintiffs'] argument that nothing in UCC 4-A-502 prohibits the bank from honoring creditor process to turnover the funds.* The [plaintiffs] point to UCC 4-A-502(4) which provides as follows:

> "Creditor process with respect to a payment by the originator to the beneficiary pursuant to a funds transfer may be served only on the beneficiary's bank with respect to the debt owed by that bank to the beneficiary. Any other bank served with the creditor process is **not obliged to act** with respect to the process." (emphasis added).

> The [plaintiffs] assert that the plain meaning of the provision is that it allows a bank to honor the process if it so chooses but it does not always have to honor that process.

> *Their contention is supported by the rationale for the UCC 4-A provisions* which the Official Comment explains is that, "in particular, intermediary banks are protected." McKinney's Cons. Laws of N.Y., Book 62 ½, Uniform Commercial Code § 4-A-503, Official Comment at 685 (2001 ed.).

*PMA*, 873 N.Y.S.2d at 292 (emphasis in internal quotation provided in original opinion); *accord Consub Delaware LLC v. Schahin Engenharia Limitada*, 543 F.3d 104, 112 (2d Cir. 2008) (UCC 4A-502 "merely provides that intermediary banks need not act with respect to process served upon them - it does not vest the property interest in those funds in the intermediary bank").

In *PMA*, plaintiffs obtained a judgment in the District of Rhode Island against the PLO and the Palestinian Authority ("PA"), filed for recognition of that judgment in New York County and served restraining notices on New York banks. Bank of New York ("BNY") was served and restrained $30 million in EFTs for which the Palestinian Monetary Authority ("PMA") was either the originator or beneficiary.[5] The former EFTs were suspended; BNY subsequently was re-served with plaintiffs' process. *Id.* at 284-85. The PMA commenced a declaratory judgment proceeding seeking a declaratory judgment disassociating itself from the PA and PLO. The trial

---

[5]    The PMA was established by the PA and/or PLO. The Court concluded that plaintiffs had stated a prima facie claim that the funds of PMA could be used to satisfy a judgment against the PA/PLO.

10

court granted PMA's motion for summary judgment on three grounds including that "UCC 4-A prohibits restraint by an intermediary bank, and that, in any event, title to the funds had passed from the PMA." *Id.* at 287. After thoroughly reviewing New York law on the topic, including every state court decision considered by the *Jaldhi* court, the First Department agreed with the plaintiffs and reversed the vacatur. The court held that while an intermediary bank had no obligation to honor creditor process served upon it and while it could not be liable for honoring process *or* ignoring it, if an intermediary bank chose to honor such process voluntarily or out of a perceived legal obligation, EFTs thusly restrained were property and were subject to attachment if they were the defendant's property. *Id.* at 292-93.

Similarly, in *Manufacturas Int'l*, an intermediary bank agreed to seize funds in response to a court order. The plaintiff brought an action to hold the bank liable. Judge Weinstein granted summary judgment to the bank, noting that the NY UCC 4A-503 Official Comment that "intermediary banks are protected" meant that since the in transit time for transfers is brief, intermediary banks cannot be expected to comply with injunctions by creditors. *Manufacturas Int'l*, 792 F. Supp. at 194, 196. The court therefore held that intermediary banks are not liable either when they choose, or decline, to seize EFTs pursuant to creditor process and also recognized that creditors could choose to accept the process even as an intermediary bank. *Id.* at 196.

Simply put, under both federal law and New York law, *EFTs constitute property subject to creditor process such as attachment, but intermediary banks have complete immunity from, or for, honoring that process, whichever they choose.* Hence, this Court should follow *PMA* and hold that the attachments previously effected in this matter are not subject to vacatur under the New York UCC. To the extent that *Jaldhi* is contrary to this holding – which technically it is not

11

as this issue was not considered by the *Jaldhi* court – this Court should follow state law and may

disregard federal appellate precedent that conflicts with current state law.

**C.    Defendants Have a Property Interest in the Segregated Suspense Account Into Which Funds Representing the Restrained (Former) EFTs Were Placed by the Garnishee Banks, Which Interest Lawfully Was Attached by Successive Service of a Valid Maritime Attachment Order**

**1.    Funds in the suspense accounts are not EFTs; rather, they are attachable bank credits**

The *Jaldhi* court affirmed the district court's order vacating "portions of the attachment

order that affect EFTs of which the defendant is the beneficiary" and remanded the action to the

district court to consider whether there are other grounds for vacating the remaining portion of

the attachment order "that affects EFTs of which the defendant is the originator." *Jaldhi*, 585

F.3d at 71. The *Jaldhi* court, however, did not have the following issue raised by appellant before

it: where funds representing restrained (former) EFTs subsequently are placed in a segregated

suspense bank account by the intermediary bank, may they be restrained? The distinction is

critical for when an EFT is restrained by an intermediary bank and placed in a segregated

account, it ceases to be an EFT. Instead, the funds re-located to a segregated suspense account

are simply debts in the form of a positive balance in that account:

> In a regular transaction [the intermediary bank] would have accepted and executed the wire transfer by sending a payment order to either a correspondent bank [account] with the [intermediary bank] or to another intermediary bank and then would have debited the amount from PIB's [alternatively acting as the originating bank or the receiving bank depending on whether PMA was the originator or the beneficiary] account. In this case, [the intermediary bank] did not issue a payment order but rather "debited" the amount by freezing it in suspense account, thus interrupting the usual transfer of rights and obligations.

See *PMA*, 873 N.Y.S.2d at 281. Further, here, unlike in *PMA*, the intermediary banks did not

merely suspend the funds while they were in the correspondent bank account of the originating

or beneficiary bank, but instead, it is believed that the credits were removed by the garnishee banks into a segregated "Rule B" account, consistent with the custom and practice of most, if not all, garnishee banks involved in the Rule B practice – a fact that may be confirmed once the garnishees respond to the discovery requests that would be needed before the hearing/motion contemplated by PMA could take place.

Once the former EFTs are removed to a separate account, they are nothing more than ordinary bank credits. Maritime law permits attachment of a defendant's bank credits, even though title to such funds actually lies with the bank, because the bank credits represent a debt that is owed. *See Jaldhi*, 2009 WL 3319675, at *8; *Aurora Maritime Co. v. Abdullah Mohamed Fahem & Co.*, 85 F.3d 44 (2d Cir. 1996). While the *Jaldhi* court may have reasoned that Rule B's broad "tangible or intangible" language, does not encompass ephemeral EFTs, it did not address funds in a separate account in which the defendant has a beneficial interest. As discussed below, this distinction should lead the Court to a different result than rate application of *Jaldhi*'s general holding, as Defendant advocates.

In this case, all of the banks at which suspense accounts are located were re-served with a valid order of maritime attachment that specifically identified bank accounts in which defendant has a beneficial interest. *See Mitchell Decl.* ¶ 3. The attachment of these accounts does not rest upon *Winter Storm's* holding that EFTs are a defendant's property. Hence, *Jaldhi* should not apply to these lawfully re-attached funds and the attachment should not be vacated.

## 2.    Defendants have an attachable property interest in suspense account funds

The intermediary banks' voluntary placement of the funds in a segregated account overrides any property interests in the former EFTs delineated by the UCC. NY UCC 4A-501,

entitled "Variation by Agreement and Effect of Funds-Transfer System Rule" provides as follows: "Except as otherwise provided in this article, the rights and obligations of a party to a funds transfer may be varied by agreement *of the affected party*." (emphasis added)[6]

The "affected" parties contemplated by the statute are the intermediary bank and the originating/beneficiary bank(s). *See Cmt 1*. Here, the intermediary bank, without any objection from the originating/beneficiary bank(s), placed the funds into a segregated account. At this point, whatever interest the intermediary, originating and/or beneficiary banks may have had in the wire transfer was extinguished, and replaced by a debt - the suspense account funds - in which defendant maintains a reversionary interest (actualized if the attachment is vacated in whole or in part), and plaintiff maintains a contingent interest (actualized when its underlying claim against the defendant is successful in whole or in part).

It is well-settled that courts sitting in admiralty are governed by federal maritime law, particularly where there is no state law on point. Here, it is clear that the UCC did not contemplate a garnishee intermediary banks' removal of the restrained funds from the originating or beneficiary bank's correspondent bank account to a segregated suspense account, thus reliance on federal maritime law to determine whether defendant has an attachable property interest in the suspense account is not merely appropriate, but necessary.

Without regard to title, Rule B permits the attachment of a defendant's beneficial, contingent, and/or reversionary interest in property. The definition of property in maritime law is

---

[6]     *See also* NY UCC 4A-501 Official Comment (the provision is primarily designed to give effect to private funds transfer system rules such as CHIPS, and "[t]o the extent that they do not they do not conflict with Article 4A there is no problem with respect to their effectiveness. In that case, they merely supplement Article 4A. *Section 4A-501 goes further. It states that unless the contrary is stated, funds transfer system rules can override provisions of Article 4A.* Thus, rights and obligations of a sender bank and a receiving, bank with respect to each other can be different from that state in Article 4A to the extent a funds transfer rule applies. . . *Rights and obligations arising under Article 4A may also be varied by agreement of the affected parties, except to the extent Article 4A provides otherwise.*") (emphasis added).

14

broad in scope – it ignores technical property precepts such as "title" and instead focuses on a defendant's equitable interest the property.

First, assuming that this court was to vacate the attachment of the subject funds, to who would the attached funds be released? The fairly obvious answer to this question – and the implicit point of Defendant's Motion is the Defendant. It has long been the practice of this District, this Circuit, this Court, and the practice of the banking institutions themselves, that where Rule B attached funds are released, they are released to the defendant (or pursuant to the defendant's wire transfer instructions). *See, e.g., Proshipline Inc. v. Aspen Infrastructures, Ltd.* 585 F. 3d 105, 112 (2d Cir. 2009), (in a post-*Jaldhi* opinion involving attachment of EFTs, the Second Circuit noted that "[t]he defendant *i.e.* the owner of the attached funds can make a motion pursuant to Rule E of the Supplemental Rules to contest the validity of the attachment").[7]

Here, once the common-sense conclusion is reached that if the funds would be released to the Defendant, it is axiomatic that Defendant has a beneficial, contingent or reversionary property interest in the suspense account funds. This interest is not only attachable but *has been attached* by subsequent service of a valid maritime attachment order upon the garnishee banks where the segregated suspense account is located. *See Mitchell Decl.* ¶ 3. Because Plaintiff was not fully secured following the first attachments of Defendants' funds in this action, it continued to serve garnishees even after the EFT funds were moved to the segregated account. Thus, by operation of this subsequent service, the funds attached were "reattached" by the numerous subsequent services of the attachment order, as "funds," and not EFTs. There can be no doubt

---

[7]    *See also CSL Australia Ply Ltd. v. Britannia Bulkers Plc, et al.*, 08-cv-8290 (PKL) (S.D.N.Y., order dated May 5, 2009) & (order dated Sept. 8, 2009, relying on previous release of property to defendants to preclude argument that attached funds were not its property); *Cosco Logistics (Dalian) Co. Ltd. v. Beitai Iron & Steel Group Import & Export Co.*, 08-cv-7988 (DC) (S.D.N.Y. Nov. 25, 2008) (order directing funds to be released in accordance with remittance details to be provided by defendant's counsel).

that "funds" of the Defendants in this District remain attachable property under Rule B even after *Jaldhi*.

Second, admiralty courts have regularly recognized that a maritime defendant's *beneficial* property interest in moneys being received or paid by a paying and/or receiving agent is attachable, even though the defendant has no "title" to the funds. *See, e.g., Petrohawk Energy Corp. v. Law Debenture Trust Co.*, No. 06-nc-9404 (DLC), 2007 U.S. Dist. Lexis 5803 (S.D.N.Y. January 29, 2007) (explaining the meaning of "paying agent" in a commercial context); *Tarstar Shipping Co. v. Century Shipline Ltd.*, 451 F. Supp. 317, 324 (S.D.N.Y. 1978) (explaining concept of "paying agent" in the maritime industry, where it is common for owners and/or charterers to utilize agents for the receipt and/or payment of freight, hire or other assets). Paying agents transfer sums from, or receive assets in, accounts in their name, but the beneficial interest in these moneys lies with the principal on whose behalf the funds are either being paid or received. This beneficial property interest is attachable under maritime law.

Meanwhile, at least one court in this District has permitted a maritime plaintiff to attach a defendant's contingent interest in funds the defendant attached (as plaintiff in another matter). *See Sachem Shipping v. industrial Carriers Inc.*, 08-cv-8698 (Swain, J.) (while the proposed restraint related to EFTs, the defendant's contingent interest in the attached property that actualizes upon defendant's prevailing on the merits of its case was attachable property).[8] Where

---

[8]    Furthermore, under New York attachment law, a defendant's contingent or reversionary interest in escrow account funds is attachable. Attachment is available to reach funds in escrow accounts either under Rule B or the CPLR. *Astrea United Investments, L.P. v. B. T Onitiri*, 92 Civ. 0581 (MBM), 1992 WL 346353, at *3 (S.D.N.Y. 1992) (citations omitted); see also *Gala Enterprises, Inc. v. Hewlett Packard Co.*, 970 F. Supp. 212, 217 (S.D.N.Y. 1997). Escrow accounts are subject to writs of attachment if the debtor retains sufficient control over the funds to render the funds subject to execution. *Gala Enterprises*, 970 F. Supp. at 217 (*citing Koroleski v. Badler*, 303 N.Y.S.2d 221 (2d Dep't 1969) and *Astrea United*, 1992 WL 346353, at *3). In determining attachability under New York law, a defendant has an "interest" in the funds if "any part of [the money is] within the present or future control of the defendant." Id. (quoting *UR. C., Inc. v. Applied Images, Inc.*, 431 N.Y.S.2d 859, 860 (Sup. Ct. Nassau Cty. 1980)). For example, in *Koroleski*, the court found the judgment debtor's interest in the escrow account

16

Defendant was the originator of the wire transfers, its account at the originating bank was debited in the amount of the applicable suspense account credits by the originating bank. The originating bank then caused its own account at the intermediary bank to be credited, whereupon the funds were first restrained and then debited from that account by the intermediary bank, i.e. the funds were transferred to a segregated suspense account. Because the beneficiary's bank never accepted the payment order, the beneficiary's account was never credited and the originator did not satisfy its debt to the beneficiary. See NY UCC 4A-406.[9] In this scenario, the only party that is not "whole" is the defendant: the banks have not incurred any loss (nor have they claimed any in this action)[10] and the beneficiary is still owed a debt by the originator.

When the defendant is the beneficiary, the custom and practice in the maritime industry, as well as the explicit or implicit agreement between Defendants and their obligors in this specific case, is that where an originator makes a payment to a beneficiary such as Defendants (with an order of maritime attachment against it) and the funds are restrained, the originator's debt to the beneficiary is satisfied. Once again, in this scenario, the only parties that are not "whole" are the Defendants: the banks have not incurred any loss (nor have they claimed any in this action); and the beneficiary has neither received payment nor is it owed money by the originator.

---

sufficient to permit attachment where the balance of the funds were to be returned to the debtor after satisfaction of all debts.  303 N.Y.S.2d at 222-23.

[9]    NY UCC 4A-406, entitled "Payment by Originator to Beneficiary; Discharge of Underlying Obligation," subsection (1), provides that "the originator of a funds transfer pays the beneficiary. . . at the time a payment order for the benefit of the beneficiary is accepted by the beneficiary's bank," subsection (2) provides that "[i]f payment under subsection (1) is made to satisfy an obligation, the obligation is discharged to the same extent discharge would result from payment . . . .").

[10]    Indeed, to the best of Plaintiff's counsel's knowledge, no originating, beneficiary, or intermediary bank has *ever* claimed any interest in attached funds in a Rule B action. This fact is all the more peculiar given the property rights these institutions ostensibly have in the attached funds pursuant to NY UCC 4A. As a practical matter, the most likely reason for this apparent anomaly, which is recognized in the comments to UCC 4A, is that these parties have contracted their property interest away, and the risks along with it.

Thus, regardless of whether Defendant is the beneficiary or originator of the funds transfers attached, Defendant is the only party that would ostensibly be entitled to "recovery" of the funds if they were released.[11] *Esso Standard (Switzerland) v. The Arosa Sun*, 184 F. Supp. 124 (S.D.N.Y 1960) (holding "admiralty has not permitted technical niceties to defeat rights of foreign attachment. This is in accord with the well recognized principle pervading admiralty practice generally that equitable principles rather than technical rules and forms should be the paramount consideration and that the objective is to do substantial justice between the parties") (internal citations omitted).

Third, once a funds transfer is interrupted (as in this case), UCC Article 4A extends property rights in the suspense account funds to the originator of the wire transfer. As previously stated, because the beneficiary's bank never accepted the payment order, the beneficiary's account was never credited and the originator did not satisfy its debt to the beneficiary. Indeed, the drafters of UCC Article 4-A were cognizant of this fact, which is why they provided for a "money back guarantee" to the originator in the event that a funds transfer fails. See N.Y. U.C.C. 4-A-402 & cmt. 2.

Pursuant to this statute's provisions, in the event that a funds transfer is interrupted after the originating bank's account at the intermediary bank has been debited, the originating bank is nevertheless entitled to payment from the originator (the defendant) and the originating bank is

---

[11]    Defendant has not addressed its interest in the attached funds. Presumably, this is in frank recognition of the fact that in their moving papers, they have effectively argued that under *Jaldhi* the attached EFTs were *NOT* its property – which would call into question whether it even has standing to seek vacatur of the attached funds in the first place, a significant threshold issue that should be addressed before to any substantive consideration of the relief sought by the Defendant.

In any event, there can be no doubt that "funds" of the Defendant in this District remain attachable property under Rule B even after *Jaldhi*. Subsequent to the Second Circuit's decision in *Jaldhi*, a judge in the Second Circuit denied as moot a motion to stay an order directing the release of funds from the court registry on the basis that the plaintiff had already reattached the funds in the hands of defendant's counsel. *See India Steamship Co. Ltd. v. Kobil Petroleum Limited*, No. 09-4564-cv (2d Cir. Nov. 3, 2009) (GEL) (not officially reported).

18

entitled to repayment from the intermediary bank. Accordingly, pursuant to N.Y. UCC 4-A-402(5), the originator (the defendant) is "subrogated to the right of [the originating bank] under subsection (d) [subsec. (4)] to the right of the [originating bank] to a refund of payment from [the intermediary bank]. Hence, the defendant has a clearly defined contingent interest in the very property under attachment, and *that interest is attachable*.

The attachment of a maritime defendant's contingent interest in property has been a settled issue for the nearly 80 years following of Learned Hand's decision. In *Kingston Dry Dock Co. v. Lake Champlain Trans. Co.*, 31 F.2d 265 (2d Cir. 1929), the plaintiff attached canal boats that were still owned by another but in which the defendant had an interest because of payment to the vessels' (fitted) owner of a substantial portion of the purchase price. It was undisputed that the defendant had no title to the attached vessel. Nevertheless, the Second Circuit held that the attachment was valid:

> The right to proceed by foreign [maritime] attachment rests upon the power of the Supreme Court... to regulate practice in the admiralty, and upon its second rule in admiralty, supplemented by admiralty rule 19 of the Eastern District of New York (*Manro v. Almeida*, 10 Wheat. 473, 6 L.Ed. 369; *Smith v. Miln*, Abb. Adm. 373, Fed. Cas. No. 13,081). The Supreme Court rule, following very ancient practice, provides that the libellant may attach the respondent's "goods and chattels, or credits and effects in the hands of garnishees." "Effects" covers chattels (*The Alpena* (D.C.) 7 F. 361), and we are to say whether "goods and chattels" covers "equitable interests" in chattels in the possession of a respondent. Attachment in the admiralty, from the time of Clerke's Praxis, included what we now call garnishment; that is, a levy upon debts owed a respondent. *While we can find nothing on the point, it appears to us absurd to suppose that, although the respondent's interest could thus have been garnished, had the boats been in the possession of the conditional seller, it may not be attached by manucaption while they were in its own. Yet this is the necessary consequence of the position taken. We hold that the attachment was valid, and the general appearance was sufficient for jurisdiction.*

*Id.* at 266-67 (emphasis added). Similarly, courts have allowed attachment of funds that were advance payments on an executory contract. *See, e.g., Vamvaship Maritime Ltd. v. Shivnath Rai*

19

*Harnarain (India) Ltd.*, No. 06 Civ. 1849, 2006 WL 1030227, at *2.3 (S.D.N.Y. Apr. 20, 2006) (upholding attachment of prepayment of executory contract, even where third-party contractor subsequently cancelled its contract, because the defendant had a property interest in the attached funds that was more than a "mere expectancy").

**POINT II**

**THE NEW RULE ANNOUNCED IN *JALDHI*
NEED NOT DETERMINE THE OUTCOME OF WHETHER
DEFENDANT'S FUNDS REMAIN UNDER ATTACHMENT**

When NY UCC Article 4-A was adopted, New York's Court of Appeals did not give retroactive effect to its provisions. *See Banque Worms v. BankAmerica Int'l*, 77 N.Y.2d 362 (1991); see also *Manufacturas Int'l Ltda. v. Manufacturers Hanover Trust Co.*, 792 F. Supp. 180 (E.D.N.Y. 1992), *aff'd*, 47 F.3d 1159 (2d Cir.), *cert. denied*, 515 U.S. 1132 (1995) (NY UCC governing regulation of funds transfers did not apply retroactively to electronic funds transfers that were seized prior to effective date of article). Furthermore, Judge Weinstein in *Manufacturas Int'l* refused to apply NY UCC Article 4A to vacate a pending attachment after its enactment. 792 F. Supp. at 194.

Similarly, this Court should follow the Court of Appeals' and Judge Weinstein's analyses to not apply *Jaldhi* retroactively. It is true that, as a general rule, judicial decisions are retroactive in the sense that if a new rule of law is applied to the parties in the rule-creating case (here *Jaldhi*), then it should be applied retroactively to similarly situated parties in all pending cases. *See Harper v. Va. Dep't of Tax*, 509 U.S. 86, 97 (1997); *Margo v. Weiss*, 213 F.3d 55, 60 (2d Cir. 2000). Subsequent to *Harper*, the Supreme Court recognized "the unsurprising fact that, as courts apply 'retroactively' a new rule of law to pending cases, they will find instances where that new rule, for well-established legal reasons, does not determine the outcome of the case."

20

*Reynoldsville Casket Co. v. Hyde*, 514 749, 758-59 (1995). The Second Circuit has recognized this principle stating that "in some exceptional cases, courts may shape relief in light of disruption of important reliance interests or the unfairness caused by unexpected judicial decisions." *Margo*, 213 F.3d at 60 n,2 (*quoting Hyde*, 514 U.S. at 761-62 (Kennedy, J. & O'Connor J., concurring). The *Hyde* Court used the following examples as instances where the new rule does not determine the outcome of the case:

> (1) an alternative way of curing the constitutional violation, or (2) a previously existing, independent legal basis (having nothing to do with retroactivity) for denying relief, or (3) as in the law of qualified immunity, a well-established general legal rule that trumps the new rule of law, which general rule reflects both reliance interests and other significant policy justifications, or (4) a principle of law, such as that of "finality" present in the Teague context, that limits the principle of retroactivity itself.

*Id.* at 759. The *Hyde* Court also made clear that the above list was not exhaustive and that there might be "other special circumstance{s} that might somehow justify" determining the outcome of a situation by applying a law other than that announced in the unexpected judicial decision. The concurrence in *Hyde* of Justices Kennedy and O'Connor recognizes that the court "cannot foresee the myriad circumstances" that arise when unexpected judicial decisions are announced. *Id.* at 761. Plaintiff respectfully submits that the circumstances now before this Court, namely the appropriate disposition of the Defendant's funds under attachment in light of *Jaldhi*'s unexpected and procedurally unusual overturning of *Winter Storm*, qualifies as one of the myriad of unforeseen circumstances to which the Supreme Court has referred.

Of relevance here is the second example (set forth above) of the Supreme Court in Hyde, namely "a previously existing, independent legal basis (having nothing to do with retroactivity)." 514 U.S. at 758-59. As discussed in detail in Point I, the relief herein sought by Plaintiff is based

21

on the fact that New York law *does* permit intermediary banks to honor creditor process served

upon them, and that the resulting attachments *do not* contravene New York law as set forth in

NY UCC 4A-503. Unlike the situation faced by the respondent in *Hyde*, maintaining the

attachment of Defendants' funds in this action does not depend on the continued application of

*Winter Storm's* ruling with respect to the attachable nature of EFTs. There is an independent

basis (having nothing to do with retroactivity) upon which the relief sought by Plaintiff is based.

The independent basis is set forth in *PMA*, in that New York law does not prevent a bank from

honoring a creditor's process and that attachments of defendants' property resulting from such

process are valid. Conversely, in *Hyde*, the maintenance of the respondent's action critically

depended on the continued application of Ohio's "tolling" principle, which the Supreme Court

had found unconstitutional. *Id.* at 757. As the *Hyde* Court explained:

> the ordinary application of a new rule of law "backwards," say, to pending cases,
> may or may not, involve a further matter of remedies. Whether it does so, and, if
> so, what kind of remedy the state court may fashion, depend-like almost all legal
> issues-upon the kind of case, matter, and circumstances involved.

*Id.* at 754-55. The "backward" application of *Jaldhi* most certainly does implicate the matter of

remedies, which here is clearly governed by New York law since even though this action is not

pending in a New York state court, *Jaldhi* relied exclusively upon New York law in fashioning

its ruling. *See Id.* at 754. Accordingly, in determining the appropriate disposition of the funds

currently under attachment in this action, this Court should look to *PMA* (having nothing to do

with retroactivity), which unequivocally states that "nothing in [the UCC] prohibits the bank

from honoring creditor process to turnover [attached EFT] funds." This approach is consistent

with the current Supreme Court jurisprudence on retroactivity because it is based on a pre-

existing, separate and independent rule of state law, not the continued application of *Winter*

22

*Storm. See Hyde*, 514 U.S. at 755-57. Defendant's overly simplistic and shallow assertion that *Jaldhi* calls for immediate vacatur of the attached funds in this action ignores the factual distinctions between this case and *Jaldhi*, as well as the equitable interests at stake regarding its retroactive application and the clear requirement that this Court determine what the law is, not parrot what Defendant would like it to be.

## POINT III

### THIS COURT SHOULD EXERCISE ITS EQUITABLE POWER TO MAINTAIN THE *STATUS QUO* AND RETAIN THE FUNDS UNDER ATTACHMENT

This Court may exercise its considerable discretion in declining to release the attached funds so as to ensure satisfaction of an eventual judgment in Plaintiff's favor. *See Aqua Stoli*, 460 F.3d at 437 (noting one of the historical purposes of Rule B attachment has always been to "assure satisfaction of a judgment"). At least two questions result from Plaintiff's request: does this Court have the power to maintain the status quo after *Jaldhi*? And, if the answer to that question is "yes," then why should the *status quo* be maintained? The reason is simple: if unchecked, the ripples resulting from *Jaldhi* will have a crippling impact on pending matters such as this where tribunals and creditors are severely prejudiced and damaged by the new ruling where no additional security means the underlying claims will be abandoned; third parties, themselves originators and beneficiaries of EFTs, will be less sure of their rights to released funds.

As to the first question concerning the Court's equitable power, the Supreme Court has recognized, "[e]quity is no stranger in admiralty; admiralty courts are, indeed, authorized to grant equitable relief." *Vaughan v. Atkinson*, 369 U.S. 527, 530 (1962) (citing *Swift & Co. v. Compania Caribe*, 339 U.S. 684, 691-92 (1950)). For example, in *Swift & Co.*, the Supreme

Court stated "[w]e find no restriction upon admiralty by chancery so unrelenting as to bar the grant of any equitable relief even when that relief is subsidiary to issues wholly within admiralty jurisdiction." 339 U.S. at 691-92. In *Vaughan*, the Court applied this principle to grant a seaman attorneys' fees expended in his suit for maintenance and cure. 369 U.S. at 530. This equity principle also was articulated by then Second Circuit Judge Thurgood Marshall in *Greenwich Marine, Inc. v. S.S. Alexandria*, 339 F.2d 901, 905 (2d Cir. 1965) ("[t]he inherent power to adapt an admiralty rule to the equities of a particular situation is entrusted to the sound discretion of the district court sitting as an admiralty judge, and not to the circuit judges sitting in review.")

*Jaldhi* addresses the "strains" and "unforeseen consequences" on the federal courts and banking system that resulted from the *Winter Storm* ruling. 585 F.3d at 61-62. With respect to maritime law, the *Jaldhi* court stated, "[overturning *Winter Storm* will dramatically affect the law of maritime attachments in our Circuit, but we must not overstate the practical effect of our holding in this case" and went on to address limitations on the Rule B process that have occurred since *Winter Storm*. 585 F.3d at 62. The cases cited by the *Jaldhi* court, however, limited the reach of *Winter Storm* and did not in any way foretell the immediate overruling of *Winter Storm*. Nor did they in any way lessen the effect of the *Jaldhi* decision for the many plaintiffs with cases currently pending and monies currently under attachment in the Southern District of New York as the Court in *Jaldhi* suggests.

Numerous maritime creditors, including Plaintiffs, have relied on the well-established law in the Second Circuit as set forth in *Winter Storm,* 310 F.3d at 278, that "EFT funds in the hands of an intermediary bank may be attached pursuant to Admiralty Rule B(1)(a)." Plaintiff urges this Court to carefully consider the Second Circuit's pronouncements just last September in *Consub Delaware* when assessing the propriety of granting equitable relief. The *Jaldhi* court

24

barely addressed *Consub Delaware*, stating in a footnote that it is abrogated to the extent it relied on *Winter Storm*. 585 F.3d at 61 n.3. But the *Consub Delaware* court did more than just rely on *Winter Storm* or make a passing reference to it. Rather, that court took pains to eliminate any doubts that may have lingered as to whether *Winter Storm's* ruling regarding the attachable nature of EFTs was settled law when stating "[o]ur holding today ought to jettison any speculation that this [foot]note [6] in *Aqua Stoli* foretold the demise of *Winter Storm*." *Consub Delaware*, 543 F.3d at 109.

The Second Circuit's use of nautical terminology is interesting to note: "Jettison" means "the act of throwing goods overboard to lighten a ship or *improve the stability* in stress of weather, necessity or emergency." René de Kerchove, International Maritime Dictionary 407 (2d ed. 1961) (emphasis added). In *Consub Delaware*, the court was "shoring" up its previous decision in *Winter Storm* and went a step further when stating, "in any event, *Winter Storm* was correctly decided," provided independent analysis for rejecting New York UCC arguments made by the appellant and policy reasons for "supporting the application of Rule B, rather than state law, to maritime attachments." 543 F.3d at 112.

Plaintiff emphasizes these statements so that the Court can assess from an equity standpoint whether it is appropriate to release the attached funds in light of *Jaldhi* when the Second Circuit's statements in *Consub Delaware* as to the substantive law of EFTs attached at intermediary banks are so dissimilar. Indeed, the *Jaldhi* panel's use of the "mini en banc" process to immediately overturn well-settled and recent law was not even considered by the *Consub Delaware* court to be worth referencing as a possible option for future appellate panels:

> Even if there existed some question as to the viability of *Winter Storm*, it is well established in this Circuit that "one panel of this Court cannot overrule a prior decision of another panel, unless there has been an intervening Supreme Court

25

decision that casts doubt on [this Court's] controlling precedent," . . . . There has been no intervening Supreme Court case, and no decision by an en banc panel overruling *Winter Storm.*

543 F.3d at 110 (internal citations omitted). The preceding passage contains very strong statements that the Second Circuit's ruling in *Winter Storm* was a well-established rule of law and that principles of *stare decisis* are not immediately thrown on their head; ironically *Consub Delaware* has been cited by several courts for this very principle. *See, e.g., Stokes v. Girdich*, No. 07-0223-pr, 2009 WL 579139, at *1 (2d Cir. Mar. 5, 2009); *United States v. Vallee*, 304 Fed. Appx. 916, 920-21 (2d Cir. 2008) (declining to overrule Second Circuit controlling precedent when it has not been cast into doubt). Even the amicus curiae brief of the CHA, relied heavily upon by the *Jaldhi* court, stated that the CHA "recognize[d] that an appeal where no party challenges *Winter Storm* is not the ideal vehicle to correct that decision." See CHA *Jaldhi* Brief Amicus Curiae. Hence, there was no way for any Rule B maritime creditor to foretell that the Second Circuit would overrule *Winter Storm*, particularly when its holding was not under direct scrutiny in *Jaldhi*. The CHA Brief conceded that *Winter Storm* was not even under consideration when it concluded that "[the remedy for *Winter Storm* and the problems it created is to overrule that decision, but in the meantime at least it should not be extended" to beneficiary EFTs. *Id.* at 29 (emphasis added). As the CHA Brief makes clear, there is a vast difference between limiting the application of a well-established rule of law, and overruling that rule. This is particularly the case when there is *overwhelming uniform reliance* on the well-established rule. As is explained in the accompanying Declaration of Michael J. Mitchell, the Plaintiff in this matter, as well as the international shipping community at large, has relied on well-established law since *Winter Storm* in 2002 that in the Second Circuit EFTs in the hands of an intermediary bank are attachable property pursuant to Rule B. *Mitchell Decl.* ¶ 16.

In this case, Plaintiff considered various options for obtaining security for its claims

26

against Defendants. *Id.* Plaintiff expended costs to obtain security in New York and in so doing did not pursue other opportunities for obtaining security. *Id.* Furthermore, during the course of these proceedings Plaintiff has relied upon the Rule B security (and the reliability of that security) in deciding to not pursue alternate forms of security. Now, after the extreme expenditure of time and resources in pursuing this action and maintaining the Rule B security against Defendant's motion to vacate, it all may go for naught because of the unforeseen and unprecedented result in *Jaldhi. Id.*

For all the reasons set forth above, as well as those set forth in the accompanying Declaration of Michael J. Mitchell, releasing the funds attached in this case would be unfairly prejudicial to Plaintiff.

## POINT IV

## THIS COURT SHOULD GRANT DECLARATORY JUDGMENT TO PLAINTIFF THAT THE ATTACHMENT WAS NOT WRONGFUL

This Court may grant a declaratory judgment in connection with Rule 57. Plaintiff must establish three requirements for declaratory relief: first, that the Court has subject matter jurisdiction over the dispute; second, that there is an actual controversy between the parties, and third, that Plaintiff's claim is ripe for review.

The alleged "wrongful" nature of the attachment, *see Mitchell Decl.* ¶ 6, is clearly a federal question since it is based on maritime law and the application of Rule B. The nature of the controversy raised by Defendants satisfies the requirements of *MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 126 (2007): that the dispute be "definite and concrete, touching the legal relations of parties having adverse legal interests." *Id.* Plaintiff's request is ripe because Defendant has raised allegations regarding the nature and quality of the Rule B attachment granted by this Court. *See Mitchell Decl.* ¶ 6. Furthermore, given the instant proceeding, the

resolution of this matter within the Court's specific knowledge and expertise is clearly superior to that of any foreign arbitrator asked to review the decision of a tribunal made months earlier.

## **CONCLUSION**

For all the foregoing reasons, this Court should not vacate the maritime attachments already effected in this matter.

Dated: January 7, 2010
    New York, New York

                                      Plaintiff
                                      PCL (SHIPPING) PTE LTD.

                              By: _____
                                Michael J. Mitchell
                                Michael J. Mitchell, P.C.
                                494 Eighth Avenue, 7th Floor
                                New York, NY 10001
                                Telephone:    (646) 328-0120
                                Facsimile:    (646) 328-0121
                                Email:        mimoma@rcn.com

28